**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Richard P. Matsch**

Civil Action No. 12-cv-00928-RPM

VRC, LLC, a Colorado limited liability company,

   Plaintiff,

v.

RCR VAIL, a Colorado limited liability company,
LARRY PETERSON, an individual,
SLIFER SMITH & FRAMPTON – VAIL ASSOCIATES REAL ESTATE, LLC, a Delaware
limited liability company,

   Defendants.

---

**MEMORANDUM OPINION AND ORDER ON MOTIONS FOR SUMMARY
JUDGMENT**

---

Defendant RCR Vail, LLC ("Defendant Seller") is an affiliate of Vail Resorts Development Company ("VRDC") whose ultimate parent is Vail Resorts, Inc.  Defendant Slifer Smith & Frampton—Vail Associates Real Estate, LLC ("Slifer") is a real-estate brokerage company whose majority member is Vail Resorts, Inc.  Defendant Larry Peterson is a real-estate broker who worked for and/or with Slifer during the events in question. Together, Defendants developed, marketed, and sold a luxury condominium project called The Ritz-Carlton Residences, Vail ("Vail Ritz"), which is located west of Lionshead Village at the base of Vail Mountain.  On January 29, 2007, Defendant Seller entered into an Exclusive Right-To-Sell Listing Contract with Defendant Slifer to help sell units at the Vail Ritz.  [Doc. 67, Ex. B at 2.]

Plaintiff VRC, LLC is a Colorado limited liability company formed for the purchase of one of the Vail Ritz condominium units to be used by its members.  On April 25, 2007,

Plaintiff signed a Purchase and Sale Agreement ("PSA") to purchase a $3.2 million condominium ("the Condo" or "Unit 100") at the Vail Ritz and paid $407,509.13 to Defendant Seller as an earnest money deposit.

The Vail Ritz was substantially completed in August 2010.  Defendant Seller notified Plaintiff that the closing date on Unit 100 was scheduled for October 15, 2010.  Plaintiff did not appear at the closing.  Pursuant to the PSA, Defendant Seller retained Plaintiff's earnest money deposit.

In this civil action, Plaintiff brings ten claims against Defendant Seller for misrepresenting, concealing and/or omitting various material facts about the Vail Ritz:  (1) two claims under the Interstate Land Sales Full Disclosure Act ("ILSA"), 15 U.S.C. § 1701 *et seq*.; (2) four common-law claims alleging fraud or misrepresentation; (3) three claims under the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat.§ 6-1-113(2)(b); and (4) one equitable claim for unjust enrichment.  [Doc. 1 at 12-39.]  Defendant Seller has moved for summary judgment of dismissal.  [Doc. 67.]  At a motions hearing held on October 7, 2014, the Court dismissed Plaintiff's First Claim for Relief (ILSA § 1703(a)(2)(D)) as untimely and Plaintiff's Tenth, Eleventh and Twelfth Claims for Relief, brought pursuant to the CCPA, for lack of significant public impact.  [Doc. 79.]

Plaintiff asserts three common law claims against Defendants Slifer and Peterson for fraud and misrepresentation; a claim under Colo. Rev. Stat. § 12-61-807(2)(b)(VI), imposing certain duties on real estate brokers; and a negligence *per se* claim premised on a violation of the same Colorado statutory provision.

Defendants Slifer and Peterson have moved for partial summary judgment. [Doc. 66.] In their Motion, Defendants Slifer and Peterson ask only that Plaintiff not rely on certain evidence to support its common law claims.

## FACTUAL BACKGROUND

The following statements are not in genuine dispute unless otherwise indicated.

Robert Vogl was the managing member of Plaintiff VRC through a separate company, RVRC, LLC. Vogl has degrees from California State University in business administration and economics. He is an investment banker and a business consultant and is involved in "merger and acquisition activity" ranging from approximately $3 million to $40 million. [Doc. 66 at 2.] At all relevant times, he lived in Vail.

Defendants Slifer and Peterson marketed the Vail Ritz according to Defendant Seller's plan, emphasizing the Ritz Carlton brand, the Vail Ritz's proximity to a proposed ski lift and ski-village development project known as "Ever Vail," and the Vail Ritz's proposed amenities. Defendant Seller opened a Vail Ritz Preview Center in Lionshead Village in late 2005/early 2006. The Preview Center was operated by representatives of Defendant Slifer (including Defendant Peterson) who were given talking points regarding the Vail Ritz. [Doc. 72, Ex. 8.] The Preview Center contained a topographical model showing the Vail Ritz in the EverVail development and a new ski lift just to the west of the Vail Ritz, as well as wall displays of the Vail Ritz's proposed amenities. Brochures and handouts were also available.

The Defendants' knowledge regarding the importance of showing the Vail Ritz as part of a larger development is reflected in e-mails from the fall of 2006. On October 31, 2006, Katie Veine, Director of Marketing for VRDC, e-mailed Jack Hunn and Kelly Gosnell of VRDC regarding the topographical model at the Preview Center. Veine stated:

> I had a conversation a couple weeks ago with Larry Peterson regarding the way West LionsHead is displayed on the topo table. Currently the model includes horizontal development 'blobs.' Are we far enough along within the approval process to show vertical building masses? Larry believes this will help tell the story and make The Ritz look more within the future plans rather than at the western end.

[Doc. 72, Ex. 16.]   Jack Hunn agreed that the topographical model should be updated as Veine described.   [Id.]   In another November 2006 e-mail, Katie Veine told Vail Ritz brochure designers that she preferred a map depicting the Vail Ritz as part of the "West Lionshead" development because:

> [a] big part of the sales story (and in hindsight we probably should have included more information on it) is the West LionsHead development. The West LionsHead [development] is what The Ritz buyers are purchasing…a new town. The map that includes The Ritz does not include all of West LionsHead therefore not telling the whole story.

[Doc. 72, Ex. 22.]

Defendants were also discussing how to frame the Vail Ritz's amenities at this time. Kelly Gosnell of VRDC e-mailed the brochure designers and said:   "as you're making revisions – since we won't be having a restaurant we should probably remove 'dinner in Vail's most popular restaurant' from the copy."   Ann Kifer, one of the designers, responded: "That really didn't indicate that [the Vail Ritz] had a restaurant. It was intended to higjhlight [sic] Vail amenities. But if you want to eliminate it we will."   Katie Veine, VRDC's marketing director, replied:   "Keep restaurant . . . I read it as you meant it Ann."   [Doc. 72, Ex. 20.]

Brokers of the Vail Ritz were instructed  in early 2007 to tell prospective buyers that "[w]e hope for an answer from the Town [of Vail] in the Spring of 2007" as to whether the proposed ski lift would move forward; and "current plans anticipate that the lift will be operated beginning in the 2008-2009 ski season."

4

Before entering into the PSA, Plaintiff received marketing materials from Defendants.  A 2005 brochure stated that the Condo was to be built "directly adjacent to a proposed new" ski lift, which was "subject to United States Forest Service and Town of Vail approval" [Doc. 67-11 at 1]; that the Vail Ritz would be "staffed by ladies and gentlemen whose sole purpose is to provide impeccable and unobtrusive service" [Doc. 67-10 at 1]; and referred to a "media room" as one of the common spaces at the Vail Ritz [id. at 6].  Another brochure, created in late 2006, stated that the Vail Ritz was "within walking distance of a proposed new ski lift" [Doc. 68-3], that the new ski-village development "may include" a "[n]ew high-speed ski lift to Vail Mountain[,]" and that "[a]ll plans and information, including proposed ski lift, are subject to government approvals" [Doc. 68-7 at 4].  In terms of amenities, the 2006 brochure stated that "the ladies and gentlemen of The Ritz-Carlton are among the most highly trained service providers in the hospitality industry" [Doc. 68-5 at 1]; included a picture of a person getting what looks to be a head massage [id. at 2]; and listed "[r]esidence catering services and in-room dining program" and "[s]pa treatments at on-site treatment rooms or within residence" as additional services "subject to extra fees, seasonal hours, and availability" [Doc. 68-8 at 5].  There was an asterisk next to those services stating that they were "outsourced."  [Id.]

Robert Vogl testified at Plaintiff's Rule 30(b)(6) deposition that he could not specifically recall reviewing these brochures.  [Doc. 67 ¶¶ 12-13.]  Vogl said that he did not keep copies of the materials he received and could not specify what misrepresentations were made in them. [Doc. 71 ¶ 4; Doc. 71, Ex. 3 ¶ 13.]

Vogl visited the Vail Ritz Preview Center before executing the PSA.  In his affidavit, Vogl says that he saw the ski lift depicted in the topographical model at the Preview Center

and that the ski lift was not labelled as "proposed."  [Doc. 71 ¶¶ 9-10.]  Vogl testified at his deposition that unidentified individuals at the Preview Center (he did not know their names or affiliations) gave him the impression that that the Vail Ritz would have a full-service spa [Doc. 67, Ex. F at 68:9-17]; a "state-of-the-art media room or theater on-site" [id. at 69:23-70:6]; "a full-service restaurant on-site" [id. at 70:7-9]; and room service [id. at 70:12-15].

At a pre-construction sales lottery held for prospective buyers in February 2007, Vogl selected Unit 100 for purchase on behalf of Plaintiff.

Defendant Seller provided Plaintiff with a 500-page binder of documents relating to the purchase of Unit 100 on April 6, 2007.  [Doc. 67, Ex. K.]  The binder included an unsigned copy of the Purchase and Sale Agreement.  The most salient provisions of the PSA are:

1. Seller estimated that the Unit "will be Substantially Completed by November 30, 2009[]"; and stated that the Unit would be "Substantially Completed no later than January 31, 2010, unless a later date is mutually agreed upon by the parties[]";

2. Defendant Seller had entered into a licensing agreement with The Ritz-Carlton Hotel Company, LLC, which allowed Defendant Seller to use the "Ritz-Carlton" name;

3. The Ritz-Carlton would provide property management services pursuant to a Management Agreement with the home owner's association;

4. If the Management Agreement was terminated for any reason, the Condo would no longer be able to use any of the Ritz-Carlton trademarks and the Ritz-Carlton would stop providing property management services;

5. Purchaser acknowledged that it had received, read, understood and approved the Management Agreement;

6

6. "With respect to the location, size and configuration of the Unit and Common Elements, the final building plans will be substantially similar to the Working Drawings." The Working Drawings were a complete set of large architectural plans for the building that visually depicted what would be built at the Project, including all Common Elements. By signing the PSA, "Purchaser acknowledge[d] and agree[d] that it has had the opportunity to review the Working Drawings and that it approves the Working Drawings."

7. There was no guarantee of "ski-in-ski-out" access from the Condo to Vail Mountain; Purchaser acknowledged "that such access many not be available and that in any case Seller and its affiliates do not control the provision of such access" and that "means and ways of access from and to [Vail Mountain] are presently owned and controlled by the United States Forest Service";

8. Purchaser acknowledged that the development of "Other Properties" adjacent to or in the general vicinity of the Project was subject to "the land uses permitted by the Town's zoning ordinances, as well as any other [applicable] governmental rules, regulations, or policies in effect now or in the future . . . .";

9. "Neither [Defendant Seller] nor Seller's employees agents, officers, directors and affiliates make any representations concerning the planned uses of the Other Properties."

10. Purchaser acknowledged that it:

> has not relied upon any statements or representations regarding the Project, the Unit or the Other Properties, including, without limitation, any representations made by Seller or any agents or employees of Seller or any real estate agency or any agent, except for those statements and representations expressly set forth in [the PSA] and the Ordinances.

7

11. Section 23.16, entitled "Entire Agreement," states:

> This Agreement, together with any exhibits or documents referred to in or supplied pursuant to the terms of this Agreement (all of which are incorporated into and form a part of this Agreement by this reference), contains the entire agreement between the parties and supersedes any and all prior oral representations, covenants, understandings or other agreements between the parties or their agents, including, without limitation, any reservation for a Condominium Unit submitted to Seller by Purchaser. Such reservation is hereby terminated. Purchaser acknowledges that Purchaser has not relied upon any statements or representations regarding the development of the Project, including, without limitation, any statements or representations made by Seller or any agent or employee of Seller, or any real estate agency or agent, except for those statements and representations expressly set forth in this Agreement and the exhibits and documents incorporated herein. This Agreement may not be modified in any manner except by an instrument in writing signed by all parties.

[Doc. 66, Ex. 2 §§ 3.3, 6.4, 23.7, 23.10, 23.16).]  The PSA's substantial completion date of January 31, 2010 conformed with Defendant Slifer's Broker's Guide from February 2007, which stated that "closing with the balance of funds due" would occur in "[l]ate 2009." [Doc. 71, Ex. 7 at 3.]

A copy of the Management Agreement between Defendant Seller and The Ritz-Carlton Hotel Company, LLC referred to in the PSA was included in the 500-page binder.  In a cover letter transmitting the binder, Defendant Seller noted that the Management Agreement was one of the enclosures [Doc. 67, Ex. K]; the Management Agreement was also listed as one of the Homeowner Documents in the binder's Table of Contents [Doc. 67, Ex. L ("Condominium Management Agreement").]  The Management Agreement was not listed in the binder's document index.  [Doc. 71 ¶¶ 27-28.]  The Management Agreement stated that the Vail Ritz was only a "Ritz-Carlton" property because of the Management Agreement and would bear the name "Ritz-Carlton" only while the Management Agreement was in effect. The Agreement further stated that the Ritz-Carlton could terminate the Agreement without

cause with 120 days advance notice.  [Doc. 66, Ex. 3 §§ 3.2 and 4.9.]  Defendants Slifer and Peterson knew that the Management Agreement was cancellable without cause with 120 days' prior notice.  [Doc. 71, Ex. 33 at 210:7-15.]  Defendants Slifer and Peterson did not specifically inform Plaintiff about that provision.  Vogl claims he was not aware that the Management Agreement was in the PSA binder.  [Doc. 71, Ex. 3 ¶ 23.]

The binder included a copy of the Property Report filed by Defendant Seller with the U.S. Department of Housing & Urban Development.  The Property Report advised on the front page:  **READ THIS PROPERTY REPORT BEFORE SIGNING ANYTHING**."  [Doc. 66, Ex. 4 (bold in original).]  The Property Report identified "December 2010" as the estimated date construction would be completed on various components of the Condo, including the parking garage, the sewer and water systems, and the electric, telephone, and natural gas service lines.  [Id. at 10, 12, 13, 15-17.]  The Report stated more generally that "[c]ompletion of the Condominium is scheduled for December 2010 after which time occupancy is anticipated."  [Id. at 25.]

Vogl engaged an attorney to review the PSA and the binder of documents.  [Doc. 67, Ex. F at 187:24-189:4.]  Karin Millette, Vogl's long-time fiancée and a licensed real-estate broker in Colorado for 30 years, reviewed the materials, as well.   She was an investing member of Plaintiff through a separate company of hers called Yonder Trees, LLC.  Vogl acknowledged that he had not reviewed all of the PSA or all of the documents in the binder before signing the PSA.  [Id. at 190:20-191:4; 196:10-25; 199:1-4.]

On April 19, 2007, Vogl signed a receipt acknowledging that Plaintiff had received a copy of the Property Report and was given an opportunity to read it before signing the PSA.  [Doc. 67, Ex. O.]  Karin Millette in her capacity as Plaintiff's real-estate agent certified that

she "made no representations to the person(s) receiving this Property Report which are contrary to the information contained in this Property Report." [Id.]  Defendant Seller and Plaintiff signed the PSA for Unit 100 on April 25, 2007.  [Doc. 67, Ex. M.]

By the end of April 2007, Defendants Slifer and Peterson became aware that the PSA stated that the Vail Ritz project would be substantially completed by January 31, 2010. Peterson realized that the PSA was in error, because "we had always represented that the project would take three years to build from the start of pouring the foundation, and that had not occurred as of April . . . ."  [Doc. 71, Ex. 42 at 243:17-20.]  Defendants Slifer and Peterson informed Defendant Seller of the problem.  [Id. at 246:6-12.]  Defendant Peterson testified at his deposition that he, Defendant Slifer and Defendant Seller were concerned that prospective buyers would terminate their contracts when they learned about the substantial completion date issue.  [Doc. 71, Ex. 45 at 142:1-7; see also Doc. 71, Ex. 51.]

On November 26, 2007, Amy Yurcak of Defendant Slifer e-mailed Julie Stencel, Assistant General Counsel for Vail Resorts, asking about "amendments to the existing Ritz contracts . . . ."  [Doc. 71, Ex. 49.]  Stencel responded as follows:

> We have not sent amendments to the current contract holders. While we have no intention of letting this slide indefinitely we currently have a long list of high priority – time sensitive issues . . . which legal must attend to before we add this to the mix. The amendment in this instance seeks only to clarify to the buyer an inconsistency between the property report and the actual contract. The property report contains the correct substantial completion date and the PSA does not. We are going to carefully tee up this message so everyone understands the point of the amendment is effectively to correct a typo – that's all.

[Doc. 71, Ex. 49.]

Notes from an internal marketing meeting from May 27, 2008 state that completion of the Vail Ritz was "6-8 weeks behind schedule due to shoring failure, not public knowledge,

[Defendant Slifer] wants to know if/when we relay to buyers." [Doc. 71, Ex. 48.] A June 7, 2008 e-mail from Larry Peterson to Barbara Anderson, VRDC's Director of Sales and Marketing, states "[w]e anticipate loosing [sic] 20-30 contracts and perhaps more" because of the substantial completion date issue. [Doc. 71, Ex. 51.] Defendants Slifer and Peterson never informed Plaintiff in 2007 or 2008 that Defendant Seller could not meet the January 31, 2010 substantial completion date identified in the PSA. [Doc. 71, Ex. 3 ¶ 19; Exs. 55-56.]

A July 19, 2008 memorandum from Larry Peterson to the "RCR Team" outlines a strategy to sell the remaining 24 units at the Vail Ritz. That strategy included: "Gondola: make it real by building the base station asap[]" and "Ever Vail, we need to use this future community to help us sell the RCR. This is an important item in relocating the Ritz from the fringe of Lionshead to the Center of Ever Vail." [Doc. 71, Ex. 28 at 1-2.]

Defendants marketed the Vail Ritz as "[offering] the unique combination of perfect location and world class services." [Doc. 71, Ex. 6.] E-mails from March 2009 indicate that Defendants considered the Vail Ritz's location as a potential weakness: "[s]lightly outside of Lionshead – perception is hard to get to lifts/life" [Doc. 71, Ex. 10]; "currently viewed as 'off the beaten track' . . . ; perception that it's hard to get to lifts/social activity (This will change with the emergence of EverVail plans) . . . Close proximity to sewage plant" [Doc. 71, Ex. 11]; "Arrabelle is a [comparable building in terms of quality] but . . . Arrabelle is ski in/ski out Ritz is not . . . Arrabelle is located in Lionshead (action)" [Doc. 71, Ex. 12].

On April 22, 2009, Defendant Seller offered all buyers, including Plaintiff, "a special new program" involving an Amendment to the PSA. [Doc. 66, Ex. 5.] The Amendment offered a 15% reduction in all buyers' purchase prices and a proportionate refund of their earnest

money deposits; made them eligible for membership at the Arrabelle Club and waived the

Club's $50,000 initiation fee; and modified the PSA's estimated completion date for the Vail

Ritz to October 31, 2010, and the guaranteed substantial completion date to December 31,

2010.  [Doc. 66, Ex. 6 §§ 1-3.]  The Amendment stated that "[b]y signing below Purchaser

acknowledges that the Property Report, previously delivered by Seller together with the

Agreement, contains accurate information concerning completion of construction despite the

scrivener's error in Section 6.4 of the [PSA] . . . ."  [Id.]  In an e-mail on April 23, 2009,

Karin Millette sent Vogl bullet points summarizing the terms of the Amendment; one of the

bullet points stated:  "Expected completion is October of 2010."  [Doc. 66, Ex. 7.]  Vogl

circulated Millette's e-mail summary to other members and representatives of Purchaser the

next day.  [Doc. 67, Ex. T.]

Also on April 23, 2009, Barbara Anderson, Defendant Seller's marketing and sales

director, sent an internal e-mail stating that she had just spoken with Millette by phone about

the Amendment.  According to Anderson:

> [Millette] . . . received the package today and was reviewing the paperwork when I called
> her; she said that both she and [Vogl] were very excited about the new pricing and that he
> has a greater comfort level with his purchase. As you may recall, [Vogl] was the buyer
> who . . . had asked us to push the completion date out as far as we could, because he was
> nervous about coming up with the cash at closing.

[Doc. 67, Ex. U.]  By early June 2009, Plaintiff and Defendant Seller had both signed the

Amendment.  [Doc. 66, Ex. 6.]

After receiving the proposed Amendment, a different buyer asked Defendant Slifer

whether "we have the ability to bail and recoup our deposit[.]"  [Doc. 71, Ex. 58.]  Defendant

Slifer responded:

> The short answer to your question is no. If you chose not to sign the amendment, your current contract remains binding. This means that you would purchase your unit with your current purchase price and would not receive the 15% discount. You would also not be eligible for The Arrabelle Club social membership. If you chose to walk away from your contract now, you would lose your 15% earnest money.
>
> We certainly hope that you take advantage of this great opportunity. As a reminder, the deadline for you to sign and return the amendment is May 31, 2009.

[Id.]

Vogl lives in or near Vail and passed by the site of the Project approximately three times per week. [Doc. 67, Ex. F at 274:22-275:23.]

Defendant Seller substantially completed construction of the Project on August 12, 2010, when the Town of Vail issued Seller a temporary certificate of occupancy. [Doc. 67, Ex. W.]

On August 30, 2010, Defendant Seller notified Vogl and Millette by letter that the Vail Ritz was substantially completed and scheduled the closing for October 15, 2010. [Doc. 66-9 (Ex. 10).] Plaintiff did not close on Unit 100 at the closing date and Defendant Seller retained Plaintiff's earnest money deposit.

The proposed ski lift has not been built and Defendant Peterson acknowledged that, from 2007 until 2010, in spite of knowing about the difficulties in getting the lift approved, he never provided an update or information about that issue to anyone who was under contract for a unit at the Vail Ritz. [Doc. 71, Ex. 31 at 229:14-20.] Defendant Seller continues to pursue government approval of the ski lift and the development of EverVail. [Doc. 67, Ex. A at 169:15-170:11.]

The completed Vail Ritz has private spa treatment rooms and a media room and also provides food services to residents. [Doc. 67, Exs. Z, AA, BB.] The food service appears to be provided through a different company, Vail Marriott Mountain Resort, and is not a full-

service restaurant.  [Doc. 67-63.]  The Project continues to operate under the Ritz-Carlton Management Agreement.  [Doc. 67, Ex. C.]

## DISCUSSION

### A.  ILSA § 1703(a)(2)(B) Claim

Jurisdiction for this civil action is provided by Plaintiff's remaining ILSA claim, in which it asserts that Defendants misrepresented and omitted material facts regarding the Vail Ritz, including the ski lift to the west of the development; the adjacent EverVail development; the nature of the Management Agreement with The Ritz-Carlton Hotel Company, LLC; the Amendment to the PSA; and the availability of certain amenities.

As originally enacted, ILSA § 1703(a)(2)(B) made it illegal for a developer to

> obtain money or property by means of a material misrepresentation with respect to any information included in the statement of record or the property report or with respect to any other information pertinent to the lot or the subdivision *and upon which the purchaser relies . . . .*

15 U.S.C. § 1703(a)(2)(B) (1968) (emphasis added).  The ILSA's original language could be read to impose liability on a seller if a purchaser relies on information that he considered to be material – that is, using a subjective test of reliance.  Congress removed the language of reliance when it amended the ILSA in 1979, changing the language to its present form, which provides:

> It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails--. . . (2) with respect to the sale or lease, or offer to sell or lease, any lot not exempt under section 1702(a) of this title--. . . (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision . . . .

14

15 U.S.C. § 1703(a)(2)(B). Defendant Seller asserts that there was no violation of that provision because Plaintiff has not shown reasonable reliance on any untrue statements or omissions of material fact made by Defendant Seller or its agents. Plaintiff contended at the October 7, 2014 motions hearing that reasonable reliance need not be proven here.

The purpose of the 1979 amendment to the ILSA is explained in the House Conference Report accompanying the legislation:

> While the purchaser's actual reliance would no longer have to be an element of proof, it is clear that in proving that an untrue or omitted fact was material, it must be established that the fact was important enough that a reasonable person would have relied upon it in making a decision to purchase or lease that particular piece of land.
>
> The language "in the context of the overall offer and sale or lease" was included to clarify how to determine the materiality of a fact and to make clear that a developer is not required to say everything about the subdivision in each discrete contact with the purchaser, but rather that what the developer does choose to say must not omit important facts that would be needed so that the purchaser would not be misled. Clearly, when a seller draws attention to information which is favorable to the sale of the lot and delays providing contradictory information, a purchaser may be misled. Any subsequent information of a countervailing nature must be highlighted; it is not sufficient simply to deliver the information to the purchaser. The seller by omission has taken on an affirmative obligation to make the statements clear and unambiguous to the purchaser. This is particularly important where the primary contact between the purchaser and the seller is through advertising or the mails. In this circumstance an advertisement for "lakeside property" which omits to state that the lake was dry for 6 months of the year or an advertisement for "home-sites" which fails to mention that the land was inappropriate for septic tanks and a municiple [sic] sewage system was unavailable would be misleading.

H.R. Conf. Rep. No. 96-706, 83 (1979). Thus, although the 1979 amendment dispensed with *actual* reliance, the Conference Report explained that materiality should be measured by whether, given the overall context of the offer and sale, a reasonable person would have relied upon the seller's statements and omissions in going forward with the sale or lease. Reasonable reliance, while not a discreet element of an ILSA § 1703(a)(2)(B) claim, is a necessary component of the materiality element.

15

It has been suggested that the ILSA is an anti-fraud statute. An element of a fraud claim is an intent to deceive or at least reckless indifference to the truth of representations. There is no such requirement in ILSA § 1703(a)(2)(B). The ILSA, taken as a whole, establishes a system of disclosure in interstate real-estate sales much like that in effect for the offer and sale of securities. The policy of the ILSA is to protect the integrity of the market by requiring full disclosure of all information that a reasonable person would want to know in making an informed decision to invest in a proposed real-estate development.

Accordingly, the dispositive question at this stage for Plaintiff's ILSA § 1703(a)(2)(B) claim is whether, taking the facts and drawing all inferences in Plaintiff's favor, a reasonable juror could conclude that a reasonable person in Plaintiff's position would have relied on Defendants' misrepresentations and omissions regarding the Vail Ritz in deciding to buy Unit 100.

A reasonable juror might conclude that Defendants' promotion of the ski lift as "proposed" and "subject to government approvals" and the provisions of the PSA disclaiming any external representations on mountain access put Plaintiff sufficiently on notice that the lift was not a sure thing. Taking the evidence in Plaintiff's favor, however, a reasonable juror could conclude that a reasonable person in Plaintiff's position would rely on Defendants' recurring emphasis on the ski lift in its promotions and their representations to Vogl at the Vail Ritz Preview Center to believe that it was moving ahead; and that Defendants' failure to update purchasers on the difficulties in getting the ski lift approved was a material omission that made Defendants' prior assertions misleading.

A reasonable jury might consider the EverVail development issue similarly. On the one hand, Defendants disclaimed any representations regarding the property surrounding the Vail

Ritz in the PSA.  On the other, Defendants promoted the Vail Ritz as being in the heart of a new ski village through various marketing materials, including the topographical model on display at the Vail Ritz Preview Center.  A reasonable jury could conclude that a reasonable purchaser in Plaintiff's position would rely on Defendants' extrinsic representations in deciding to acquire a unit at the Vail Ritz.

A reasonable jury might consider the PSA Amendment to be nothing more than a transparent attempt by Defendant Seller to avoid controversy about the delayed completion date by reducing the purchase price and waiving the initial fee for joining the Arrabelle Club. However, Defendants knew by that time that the ski lift had not been approved, that EverVail was not proceeding, and that the Vail Ritz would not be completed by the contractually-agreed-upon date.  And yet the Defendants offered the PSA Amendment without disclosing any of those adverse facts; instead, they framed it as a "special new program."  A reasonable jury could conclude that a reasonable purchaser would rely on those omissions and misrepresentations in deciding to sign the Amendment.

A reasonable jury might look at the Management Agreement issue and conclude that a reasonable person with Vogl's business experience would have reviewed all of the documents given to Plaintiff before executing the PSA, and therefore would have recognized that the Ritz-Carlton could cancel the Management Agreement at any time without cause, with 120-days' notice.  A reasonable jury could also conclude, however, that a reasonable purchaser in Plaintiff's position would not have come to that realization because Defendants marketed the management relationship as long-term and the PSA did not make the nature of the agreement clear.

As for the amenities on offer at the Vail Ritz, a reasonable jury could conclude, based on the PSA's merger and integration clauses, that Plaintiff could not have justifiably relied on representations regarding amenities that were extrinsic to the PSA.  A reasonable jury could also look at various marketing materials making exaggerated promises and conclude that a reasonable purchaser would rely on those materials in deciding to move ahead with a purchase and that the promotion of the Vail Ritz included misleading statements creating expectations of luxurious living that exceeded the reality of the development.

There are also differing possible views of the Plaintiff's failure to close this sale. Defendants say that they did not mislead in their promotion and that Vogl and Millette knew all of the relevant facts about the project but never raised a question or made a complaint of misleading before receiving the notice of the closing.  Plaintiff's position is simply that it was not going to pay good money after bad when Vogl realized that what VRC was buying was materially different from what was expected back in April 2007.  The choice between these views must be made by the jury.

In sum, taking the record in Plaintiff's favor on summary judgment, a reasonable jury could conclude that Defendants made misleading statements and omissions regarding the Vail Ritz upon which a reasonable person in Plaintiff's position would rely in deciding to reserve one of the Vail Ritz condos, pay earnest money, and sign the PSA and the PSA Amendment.

## B.  Common Law Claims

Plaintiff has raised various common law fraud and misrepresentation claims against the Defendants.  The Court has supplemental jurisdiction over those claims, which are governed by Colorado law.

Some of Plaintiff's common law claims require an additional showing of intent to deceive or reckless disregard for the truth.  Defendants have not challenged that aspect of Plaintiff's claims.  Instead, they attack Plaintiff's claims from the same angles as they attacked Plaintiff's ILSA § 1703(a)(2)(B) claim:  there were no materially misleading statements or omissions, and Plaintiff's reliance on those statements and omissions was not reasonable or justified.  For the reasons stated in the Court's discussion of Plaintiff's ILSA § 1703(a)(2)(B) claim, these issues should be tried by a jury.

Defendants Slifer and Peterson's Motion for Partial Summary Judgment can also be denied as inappropriate under Rule 56 because it is in essence an evidentiary motion.

**C.  Plaintiff's Unjust Enrichment Claim against Defendant Seller**

Defendant Seller argues that Plaintiff's unjust enrichment claim should be dismissed because it cannot seek return of its earnest money on equitable grounds given that the parties' PSA expressly provides that the earnest money is forfeited as liquidated damages for Purchaser's failure to close on Unit 100.  [Doc. 67 at 37.]  Plaintiff responds that unjust enrichment is a viable cause of action because it seeks to rescind the PSA based on its fraud and misrepresentation claims, which would abrogate any express contract governing the matter, and therefore make unjust enrichment "an appropriate remedy to render VRC whole including return of [Plaintiff's] earnest money."  [Doc. 72 at 42.]  Unjust enrichment is an equitable remedy, and such remedies are only available when none are available at law.  Legal remedies are available here if Plaintiff prevails on the merits.  Accordingly, the Court will dismiss Plaintiff's unjust enrichment claim.

## CONCLUSION

Upon the foregoing, it is

ORDERED that Defendants Slifer and Peterson's Motion for Partial Summary Judgment [Doc. 66] is denied; and it is

FURTHER ORDERED that Defendant RCR Vail's Motion for Summary Judgment [Doc. 67] is granted as to Plaintiff's Fifteenth Claim for Relief (unjust enrichment) and denied as to Plaintiff's remaining claims against Defendant RCR Vail.

Dated:  November 21, 2014.

BY THE COURT:

**s/Richard P. Matsch**

_____
Richard P. Matsch
Senior District Judge